**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| | : | **VIOLATIONS:** |
| | : | |
| | : | **Count One:** |
| | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| | : | |
| | : | **Count Two:** |
| **v.** | : | **18 U.S.C. § 1952(a)(3)** |
| | : | **(Use of Interstate Facilities to Promote** |
| | : | **Bribery)** |
| | : | |
| | : | **Count Three:** |
| | : | **2 U.S.C. §§ 441f and 437g(d)(1)(D)** |
| | : | **(Election Fraud)** |
| | : | |
| **MITCHELL J. WADE,** | : | **Count Four:** |
| | : | **18 U.S.C. § 371** |
| **Defendant** | : | **(Conspiracy)** |

**INFORMATION**

The United States Attorney informs the Court that:

**COUNT ONE**

**Conspiracy**

Introduction

At all times material to this Information:

1.  Defendant MITCHELL J. WADE ("WADE") was the principal owner and Chief

Executive Officer of MZM, Inc., which sold equipment and services to the United States

Department of Defense (DoD).  WADE maintained his office in MZM's headquarters, which was

located at 1523 New Hampshire Avenue, N.W., in Washington, D.C., 20036.

2. MZM also had facilities in Martinsville, Virginia; Charlottesville, Virginia; Tampa, Florida; Seoul, Korea and Baghdad, Iraq. MZM's business was dependent on its receipt of federal defense appropriations. MZM received over $150 million from DoD as a government contractor from 2002 through 2005.

3. Co-conspirator Randall Harold "Duke" Cunningham ("Cunningham") was a Member of the United States House of Representatives.

4. The "Del Mar Home" was a house located at 13832 Mercado Drive, Del Mar, California that Cunningham owned from on or about January 20, 1988, until on or about November 20, 2003. In or about late November 2003, Cunningham sold the Del Mar Home to 1523 New Hampshire Ave., LLC, and purchased a house located at 7094 Via del Charro, Rancho Santa Fe, California (the "Rancho Santa Fe Home").

5. "Top Gun Enterprises, Inc." was a California corporation based in San Diego County, California that Cunningham owned and operated at all times material to the Information. As of the date of this agreement, Top Gun Enterprises, Inc.'s office address was the Rancho Santa Fe Home.

6. The "Kelly C" was a 65-foot yacht of which Cunningham was the legal owner.

7. "Co-conspirator No. 1" was an individual who was the majority owner of a defense contractor.

8. The "Buoy Toy" was a 42-foot yacht that the defendant purchased on or about August 30, 2002. From in or about fall 2002, through in or about summer 2005, the boat (officially renamed the "Duke-Stir" on January 21, 2003) was docked in Cunningham's slip at the Capital Yacht Club, 1000 Water Street, SW, Washington, D.C.

9.  "1523 New Hampshire Ave., LLC" was a Nevada domestic limited liability company of which defendant was the managing member.

10.  "Co-conspirator No. 3" was an individual who controlled a financial company located in Rosedale, New York.

11.  "Co-conspirator No. 4" was an individual who was the president of a mortgage company located in Greenvale, New York.

<u>The Conspiracy</u>

12.  Beginning no later than 2001, and continuing through in or about June 2005, within the District of Columbia, Southern District of California and elsewhere, defendant MITCHELL J. WADE did unlawfully and knowingly combine, conspire, confederate, and agree with Randall Harold Cunningham, Co-conspirator No. 1, Co-conspirator No. 3, Co-conspirator No. 4, and others to commit the following offenses against the United States:

i.   Bribery of a Public Official, that is, WADE, Cunningham, and others conspired and agreed that defendant and others would directly and indirectly corruptly give, offer, and promise items of value, with intent to influence Cunningham in the performance of his official acts, in violation of Title 18, United States Code, Section 201(b)(2)(A);

ii.  Honest Services Mail Fraud, that is, WADE, Cunningham, and others conspired and agreed to devise and carry out a scheme to defraud the United States of its right to Cunningham's honest services, including its right to his conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and

3

corruption, and, in executing said scheme, to cause matters and things to be sent and delivered by the United States Postal Service and private and commercial interstate carriers, in violation of Title 18, United States Code, Sections 1346 and 1341; and

iii.   Honest Services Wire Fraud, that is, WADE, Cunningham, and others conspired and agreed to devise and carry out a scheme to defraud the United States of its right to Cunningham's honest services, including its right to his conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and, in executing said scheme, to transmit and cause to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, in violation of Title 18, United States Code, Sections 1346 and 1343.

iv.   Tax Evasion, that is, WADE, Cunningham, and others, conspired and agreed to willfully evade and defeat the income tax due and owing to the United States of America by Cunningham for calendar years 2001 through 2005 by concealing and disguising through various means illicit payments and benefits received by Cunningham, in violation of Title 26, United States Code, Section 7201.

<u>Manner and Means of the Conspiracy</u>

13.  In furtherance of this conspiracy, WADE, Cunningham and others used the following methods and means, among others:

a.     WADE and his co-conspirators gave, offered, and promised payments and benefits to Cunningham in various forms, including cash, checks, meals, travel, lodging,

4

furnishings, antiques, rugs, yacht club fees, boat repairs and improvements, moving

expenses, cars, and boats;

b.    Cunningham made recommendations and took other official action in order to

influence the United States Congress's appropriations of funds to benefit WADE and

other Co-conspirators and MZM;

c.    Cunningham used his public office and took other official action to pressure and

influence United States Department of Defense personnel to award and execute

government contracts in a manner that would benefit WADE and other Co-

conspirators and MZM, which Cunningham did because of his receipt of the above-

described payments and benefits, and not because Cunningham believed that using

MZM was in the best interest of the country;

d.    WADE and Cunningham attempted to conceal and disguise this conspiracy through

various means, including one-sided transactions through which defendant would buy

property from Cunningham at an above-market price, and would sell to Cunningham

property at a below-market price;

e.    WADE and Cunningham also attempted to conceal and disguise this conspiracy by

directing payments through multi-layered transactions involving corporate entities

and bank accounts that WADE and Cunningham owned and controlled, including the

following payments:

1.    by having WADE pay $500,000 to Cunningham, who caused the money to be

deposited into the bank account of a company controlled by Co-conspirator

No. 3, in order to pay off a mortgage on Cunningham's Rancho Santa Fe

5

Home that had been issued by a company owned by Co-conspirator No. 4; and

    2.    by having WADE pay Cunningham $115,100 in the form of a check made payable to Top Gun Enterprises, Inc., in order to offset the capital gains taxes owed by Cunningham on the sale of his Del Mar home.

f.    WADE also attempted to conceal and disguise this conspiracy by intentionally mischaracterizing illegal bribe payments to Cunningham as legitimate business expenses on MZM's corporate books and records.

g.    A purpose and effect of WADE's and Cunningham's attempts to conceal and disguise payments to Cunningham was to enable Cunningham to evade the lawful payment of income tax due and owing to the United States.

<u>Overt Acts</u>

14.  Within the District of Columbia, Southern District of California, and elsewhere, in furtherance of the above-described conspiracy, and in order to carry out the objects thereof, WADE and his co-conspirators committed and caused to be committed the following overt acts, among others:

a.    On or about November 16, 2001, WADE paid $12,000 (with corporate check no. 2056) to an antiques store for three nightstands, one leaded glass cabinet, one washstand, one buffet, and four armoires, which were delivered to Cunningham;

b.    On or about October 31, 2001, WADE paid $50,000 (with corporate check no. 2027) to a company controlled by Co-conspirator No. 4;

c.    On or about December 27, 2001, Co-conspirator No. 4 paid $50,000 (with corporate

6

check no. 32399) to Cunningham, which Cunningham deposited into his personal

bank account at Union Bank of California in San Diego County, California;

d.    On or about January 24, 2002, WADE paid $6,632 (with a corporate American

Express credit card) to a furniture store for a leather sofa and a sleigh-style bed,

which were delivered to Cunningham;

e.    On or about February 5, 2002, WADE paid $7,200 (with corporate check no. 2251)

to an antiques store for an antique Louis Phillipe period commode, circa 1850, and a

Restoration period commode, four drawers, circa 1830, which were delivered to

Cunningham;

f.    On or about April 6, 2002, WADE paid $13,500 (with personal check no. 4609) to

Cunningham for the purchase of a Rolls Royce automobile, which Cunningham

deposited into his personal bank account at Congressional Federal Credit Union in

Washington, D.C.;

g.    On or about May 4, 2002, WADE paid $17,889.96 (with corporate check no. 2448)

to an automotive repair shop for work done on Cunningham's Rolls Royce;

h.    On or about August 30, 2002, WADE paid $140,000 (with official bank check no

6330014624) to a third-party for the "Buoy Toy," which was moved to

Cunningham's boat slip for his use and enjoyment;

i.    On or about September 10, 2002, Cunningham failed to declare as income on his

2001 federal individual income tax return (Form 1040) over $250,000 in illicit

payments and benefits that he received during the 2001 tax year;

j.    On or about September 19, 2002, WADE paid $16,867.13 (with corporate check no.

2816) to a marine services company for repairs to Cunningham's yacht, the Kelly C;

k.     On or about October 17, 2002, WADE paid $2,000 (with corporate check no. 2906) to the owner of a marine services company for transportation expenses related to Cunningham's yacht, the Kelly C;

l.     On or about November 7, 2002, WADE paid $7,500 (with personal check no. 4781) to Cunningham for yacht club fees, which Cunningham deposited into his personal bank account at Bank of America in Virginia;

m.     On or about January 13, 2003, WADE paid $3,000 (with corporate check no. 3247) to Cunningham, which Cunningham deposited into his personal bank account at Union Bank of California in San Diego County, California;

n.     On or about January 13, 2003, WADE paid $30,000 (with corporate check no. 3248) to Cunningham, which Cunningham deposited into his personal bank account at Union Bank of California in San Diego County, California;

o.     On or about April 15, 2003, Cunningham failed to declare as income on his 2002 federal individual income tax return (Form 1040) over $250,000 in illicit payments and benefits that he received during the 2002 tax year;

p.     On or about May 8, 2003, Cunningham caused to be filed with the State of California Department of Motor Vehicles documentation which had been altered to reflect a sales price of $18,000 for a 1999 GMC Suburban, which Cunningham had purchased from WADE for the below-market price of $10,000;

q.     On or about May 1, 2003, WADE paid $8,000 (with corporate check no. 3652) to Cunningham, which Cunningham deposited into his personal account at the

Congressional Federal Credit Union in Washington, D.C.;

r.     On or about June 20-22, 2003, with corporate checks nos. 3611 and 3909, WADE paid $2,731.33 to a resort for Cunningham's lodging and meal expenses, $1,500 for a "gift certificate" (which Cunningham used to purchase a set of earrings), and $400 for a Greenbrier charm and necklace;

s.     On or about July 28, 2003, WADE purchased Laser Shot shooting simulators for himself and for Cunningham;

t.     On or about September 14, 2003, WADE paid $19,025 (with personal check no. 4989) to Cunningham, which Cunningham deposited into his personal bank account at Union Bank of California in San Diego County, California;

u.     On or about November 5, 2003, Cunningham signed a sales agreement for the sale of his Del Mar home, which reflected an inflated price of $1.5 million and listed WADE as the buyer;

v.     On or about November 6, 2003, Cunningham sought from WADE an additional $175,000 for Cunningham's purchase of the Rancho Santa Fe Home;

w.     On or about November 7, 2003, Cunningham signed a second sales agreement for the Del Mar home, which reflected a further inflated price of $1,675,000 and substituted 1523 New Hampshire Ave., LLC for WADE as the named buyer;

x.     On or about November 18, 2003, WADE caused a 1523 New Hampshire Ave., LLC check (no. 1027) in the amount of $18,160.98, and a wire transfer (sequence no. 031118003135) in the amount of $1,664,300, to be deposited into a Heritage Escrow

9

Company escrow account (no. 21260) for WADE's purchase of Cunningham's Del Mar home;

y.    On or about December 30, 2003, WADE sent by Federal Express, an interstate carrier, a check for $115,100 (corporate check no. 4704 made payable to "Top Gun Enterprises, Inc.") to Cunningham, which Cunningham deposited, the next day, into his personal bank account at Union Bank of California in San Diego County, California;

z.    On or about February 26, 2004, WADE paid $11,393.56 (with a corporate American Express credit card) to a moving company for the shipment of Cunningham's household furnishings from his Arlington Condominium to his Rancho Santa Fe Home;

aa.    On or about March 16, 2004, WADE paid $12,975.25 (with corporate check no. 4923) to an aircraft charter management company for a chartered flight he and Cunningham took;

bb.    On or about April 15, 2004, Cunningham failed to declare as income on his 2003 federal individual income tax return (Form 1040) over $500,000 in illicit payments and benefits that he received during the 2003 tax year;

cc.    On or about May 6, 2004, WADE caused $5,970,000 to be paid to a company controlled by Co-conspirator No. 1 for receipt of computer equipment and services worth substantially less than that amount, under a subcontract to a Department of Defense contract that Cunningham helped MZM secure;

dd.    On or about May 13, 2004, Co-conspirator No. 1 paid $525,000 (wire reference no.

16594) to a company controlled by Co-conspirator No. 3, in order to pay off the
second mortgage on Cunningham's Rancho Santa Fe Home;

ee.     On or about May 25, 2004, WADE paid $2,081.30 (with a corporate American
Express credit card) to a Washington, D.C., hotel for Cunningham's daughter's
graduation party;

ff.     In or about June 2004, WADE paid Cunningham $6,500 in cash;

gg.     On or about June 17, 2004, WADE paid $18,000 (with corporate check no. 5606
made payable to "Top Gun Enterprises, Inc./R. Cunningham") to Cunningham,
which Cunningham deposited into his personal bank account at Union Bank of
California in San Diego County, California;

hh.     On or about August 25, 2004, WADE paid $171,000 (with corporate check no. 6019
made payable to "Top Gun Enterprises, Inc. R.H. Cunningham"), which
Cunningham caused to be transacted through a company controlled by Co-
conspirator No. 3;

ii.     On or about August 25, 2004, WADE paid $329,000 (with corporate check no. 6023
made payable to "Top Gun Enterprises, Inc. R.H. Cunningham"), which
Cunningham caused to be transacted through a company controlled by Co-
conspirator No. 3;

jj.     On or about April 15, 2005, Cunningham failed to declare as income on his 2004
federal individual income tax return (Form 1040) over $1,000,000 in illicit payments
and benefits that he received during the 2004 tax year;

kk.     On or about May 7, 2005, WADE purchased several rugs, which were delivered to

11

Cunningham;

ll.     Between on or about November 2001 through May 2005, WADE paid more than $50,000 to various antiques stores for additional antiques and furnishings, including silver candelabras, glass vases, antique armoires, Persian-style carpets, and custom oak and leaded glass doors, all of which were delivered to Cunningham; and

mm.    Between on or about January 2001 through Spring 2005,  WADE paid more than $10,000 to various resorts, hotels, and restaurants for Cunningham's meals and entertainment expenses.

**(Conspiracy, in violation of 18 U.S.C. § 371)**.

## COUNT TWO

### Use of Interstate Facilities to Promote Bribery - 18 U.S.C. § 1952(a)(3)

1.  Paragraphs 1-11 and 13-14 of Count One of this Information are incorporated by reference as if set out in full.

2.  On or about December 30, 2003, defendant MITCHELL J. WADE used a facility in interstate commerce, to wit, commercial interstate carrier Federal Express, to send a check in the amount of $115,100 (MZM corporate check no. 4704 made payable to "Top Gun Enterprises, Inc.") from Washington, D.C. to "Duke Cunningham" in Escondido, California, with the intent to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, bribery, in violation of the laws of the United States (18 U.S.C. § 201), and defendant WADE hereafter did, and attempted to, perform and attempt to perform acts to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of said unlawful activity.

12

**(Use of Interstate Facilities to Promote Bribery, in violation of 18 U.S.C. § 1952(a)(3))**.

## COUNT THREE

### Election Fraud - 2 U.S.C. §§ 441f and 437g(d)(1)(D)

1.  Paragraphs 1 and 2 of Count One of this Information are incorporated by reference as if set out in full.

2.  Representative A was a member of the United States House of Representatives. Representative A's Campaign was Representative A's principal campaign committee, as defined in the Federal Election Campaign Act ("FECA"), Title 2, United States Code Section 431(4). Representative A's Campaign accepted contributions during the 2003-2004 and 2005-2006 election cycles to support Representative A's re-election to the United States House of Representatives.

3.  Representative B was a Member of the United States House of Representatives. Representative B's Campaign was Representative B's principal campaign committee, as defined in the FECA. Representative B's Campaign accepted contributions during the 2003-2004 election cycle to support Representative B's re-election to the United States House of Representatives.

The Scheme

4.  Beginning no later than March 2003 and continuing until no earlier than March 2005, WADE devised and engaged in a scheme in which he reimbursed MZM employees and their spouses for contributions to campaigns for the United States Congress, knowing that the resulting straw contributions were unlawful.

Unlawful Straw Contributions to Representative A's Campaign

5.  On March 26, 2003, and March 4, 2005, WADE met with certain MZM employees in his Washington, D.C., office and gave them cash or otherwise reimbursed them and, in some cases,

their spouses, for contributions to Representative A's Campaign.   The employees then used the

money that they had received from WADE to write checks to Representative A's Campaign.   The

employees delivered the checks to WADE, who handed them to Representative A.   The resulting

straw contributions, which are outlined below, were made in the names of the employees or their

spouses:

| Date of Contribution (as reported to the EFC) | Straw Contributor ("SC") | Amount of Contribution |
|---|---|---|
| 3/26/03 | SC1 | $2,000 |
| 3/26/03 | SC1 | $2,000 |
| 3/26/03 | SC2 | $2,000 |
| 3/26/03 | SC2 | $2,000 |
| 3/26/03 | SC3 | $2,000 |
| 3/4/05 | SC1 | $2,000 |
| 3/4/05 | SC2 | $2,000 |
| 3/2/05 | SC4 | $2,000 |
| 3/4/05 | SC5 | $2,000 |
| 3/2/05 | SC6 | $2,000 |
| 3/4/05 | SC7 | $2,000 |
| 3/2/05 | SC8 | $2,000 |
| 3/4/05 | SC9 | $2,000 |
| 3/5/05 | SC10 | $2,000 |
| 3/2/05 | SC11 | $2,000 |
| 3/2/05 | SC12 | $2,000 |
| 3/2/05 | SC13 | $2,000 |
| 3/4/05 | SC14 | $2,000 |
| 3/4/05 | SC15 | $2,000 |

      6.  Shortly prior to March 4, 2005, WADE met with one of MZM's supervisors in WADE's

Washington, D.C., office.  WADE provided cash to this supervisor at the meeting.  WADE

provided the cash to fund contributions to Representative A's campaign that were to be made in the name of the supervisor, the supervisor's wife, and other MZM employees. The supervisor then used WADE's cash to make a contribution in his own name and his wife's name, and to reimburse contributions made in two other MZM employees' names. The supervisor delivered the resulting four checks to WADE, who handed them to Representative A at the March 4, 2005 fund-raising event. WADE did not inform Representative A or Representative A's staff that the contributions were unlawful. The resulting straw contributions, which are outlined below, were made in the name of the supervisor, his wife, and the two employees:

| Date of Contribution (as reported to the FEC) | Straw Contributor ("SC") | Amount of Contribution |
|---|---|---|
| 3/2/05 | SC16 | $2,000 |
| 3/4/05 | SC17 | $2,000 |
| 3/4/05 | SC18 | $2,000 |
| 3/4/05 | SC19 | $2,000 |

7. In or about March, 2005, in the District of Columbia and elsewhere, defendant MITCHELL J. WADE knowingly and willfully violated the Federal Election Campaign Act by making contributions to Representative A's Campaign, a principal campaign committee for a campaign for the United States House of Representatives, in the names of others, said contributions aggregating to $25,000 or more during the calendar year of 2005.

<u>Unlawful Straw Contributions to Representative B's Campaign</u>

8. In March 2004, WADE met with certain MZM employees, and gave them cash or otherwise reimbursed them and, in some cases, their spouses, for contributions to Representative B's Campaign. WADE's cash was then used to provide contributions in the form of checks to

Representative B's Campaign in the names of the employees and, on some occasions, the

employees' spouses. The employees delivered the checks to WADE, who personally handed them

to Representative B. WADE did not inform Representative B or Representative B's staff that the

contributions were unlawful. The resulting straw contributions, which are outlined below, were

made in the names of the employees or their spouses:

| Date of Contribution (as reported to the FEC) | Straw Contributor ("SC") | Amount of Contribution |
|---|---|---|
| 3/23/04 | SC1 | $2,000 |
| 3/23/04 | SC1 | $2,000 |
| 3/23/04 | SC2 | $2,000 |
| 3/23/04 | SC2 | $2,000 |
| 3/23/04 | SC4 | $2,000 |
| 3/23/04 | SC4 | $2,000 |
| 3/23/04 | SC5 | $2,000 |
| 3/23/04 | SC5 | $2,000 |
| 3/23/04 | SC10 | $2,000 |
| 3/23/04 | SC10 | $2,000 |
| 3/23/04 | SC13 | $2,000 |
| 3/23/04 | SC13 | $2,000 |
| 3/23/04 | SC14 | $2,000 |
| 3/23/04 | SC14 | $2,000 |
| 3/23/04 | SC15 | $2,000 |
| 3/23/04 | SC15 | $2,000 |

Election Fraud

9. From in or about March 2003 through in or about March 2005, in the District of

Columbia and elsewhere, defendant MITCHELL J. WADE knowingly and willfully violated the

Federal Election Campaign Act by making contributions to Representative A's Campaign and

16

Representative B's Campaign, principal campaign committees for campaigns for the United States House of Representatives, in the names of others, said contributions aggregating to $25,000 or more during the calendar years of 2004 and 2005.

**(Unlawfully Making Campaign Contributions in the Name of Another,
in violation of 2 U.S.C. §§ 441f and 437g(d)(1)(D)).**

## COUNT FOUR

### Conspiracy

1. Paragraphs 1 and 2 of Count One of this Information are incorporated by reference as if set out in full.

2. The Department of the Army's National Ground Intelligence Center (NGIC), located in Charlottesville, Virginia, was an intelligence analysis organization for DoD tasked with producing intelligence used by U.S. armed forces.

3. The DoD Counterintelligence Field Activity (CIFA) was located in Arlington, Virginia, and developed and managed DoD Counterintelligence (CI) programs and functions, including CI support to protect DoD personnel, resources, critical information, research and development programs, technology, critical infrastructure, economic security, and U.S. interests, against foreign influence and manipulation, as well as to detect and neutralize espionage against the DoD. The predecessor to CIFA was the Joint Counterintelligence Assessment Group (JCAG).

4. The Facilities Infrastructure and Engineering Systems (FIRES) program involved scanning and digitizing various documents, information technology and database processing, and sensitive survey work for the NGIC.

5. A Blanket Purchase Agreement (BPA) was a contract vehicle that permitted DoD and

other departments and agencies to obtain supplies and services on an as-needed basis through a "charge account" system.

6. On or about September 27, 2002, MZM entered into a BPA with the Defense Information Technology Contracting Organization (DITCO), making MZM eligible to receive up to $225 million by performing work for DoD customers, including providing goods and services to NGIC and CIFA. The BPA was set to expire on May 12, 2007. MZM's ability to obtain funds under the BPA was dependent, in part, on performance. The initial task order to MZM under the BPA was for work on a FIRES project.

7. "Official" was the Program Manager for the FIRES project. In that capacity, Official's performance of his duties could affect whether or not MZM received task orders under the $225 million BPA. Official's duties included the authority to: 1) provide a performance evaluation of MZM to DITCO; 2) request, via a statement of work, that MZM act as a prime contractor on the FIRES project by utilizing the BPA; and 3) evaluate and monitor performance of MZM on task orders for the BPA.

<u>The Conspiracy</u>

8. Beginning no later than February 2002, and continuing through no earlier than June 2004, in the District of Columbia and elsewhere, defendant MITCHELL J. WADE did unlawfully and knowingly combine, conspire, confederate, and agree with Official and other DoD employees to commit the offense against the United States of Honest Services Wire Fraud, that is, to devise and carry out a scheme to defraud and deprive DoD of its right to the honest and faithful services of Official and other employees of DoD, performed free from deceit, favoritism, bias, self-enrichment, self-dealing and concealment and, in executing said scheme, to transmit and cause to be transmitted in interstate

18

commerce by means of wire communications, certain writings, signs, signals, and sounds, in violation of Title 18, United States Code, Sections 1346 and 1343.

Manner and Means of the Conspiracy

9.  WADE provided benefits to Official and other DoD employees in order to influence, induce and otherwise improperly cause them to show bias toward MZM in the discharge of their official duties, in ways that would enrich MZM and WADE.  WADE knew or was willfully blind to the fact that Official and other DoD employees did not fully disclose the benefits that they had received from MZM and WADE.  Official and other DoD employees accepted these benefits, while having the capacity to exercise their official duties in ways that would enrich MZM and WADE.

Overt Acts

10.  Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy, and in order to carry out the objects thereof, WADE and his co-conspirators committed and caused to be committed the following overt acts, among others:

a.    In or about February 2002, WADE helped to arrange for Official's son to be hired as an MZM employee.  The son's employment was based on a contract in which JCAG reimbursed MZM for the time spent on the contract;

b.    On or about September 26, 2002, Official provided a positive evaluation of MZM's performance to DITCO, knowing that this evaluation would aid MZM in obtaining task orders under the $225 million BPA;

c.    Official recommended that MZM receive contracts under the new BPA for the duration of the FIRES project, resulting in a first task order on October 18, 2002, for $194,000;

19

d.      On or about March 9, 2003, in electronic mail sent from Virginia to Washington,

D.C., Official provided to WADE procurement information that MZM could use to

tailor a proposal to DITCO for work to be performed under the BPA;

e.      No later than mid-2004, WADE and Official discussed possible employment of

Official at MZM;

f.      In or about July 2004,WADE hired Official as an employee of MZM.

**(Conspiracy, in violation of 18 U.S.C. § 371)**.


Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY


_____
HOWARD R. SKLAMBERG
JOHN P. CARLIN
Assistant United States Attorneys
555 4th Street, N.W., Room 5822
Washington, DC 20530