UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case Number 06-049 (RMU)** |
| v. | : | |
| **MITCHELL J. WADE** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing.

### PROCEDURAL BACKGROUND

On February 24, 2006, the defendant, Mitchell Wade, pleaded guilty to four crimes. First, he conspired to pay approximately $1.8 million in bribes to Congressman Randall Duke Cunningham, in violation of 18 U.S.C. § 371. Second, he violated 18 U.S.C. § 1952 by using interstate facilities to promote this bribery scheme. Third, he committed election fraud, in violation of 2 U.S.C. § 441f, by making $78,000 of illegal campaign contributions to two Members of the House of Representatives. Finally, Wade violated 18 U.S.C. § 371 by conspiring to provide benefits to Defense Department officials to influence them to show bias towards Wade's business.

Wade provided extremely extensive cooperation with the government's investigation, and the Court agreed to delay Wade's sentencing so that his sentence could reflect this cooperation. As detailed below, the government seeks a sentence that both punishes Wade for mammoth acts of corruption and recognizes the full extent of his cooperation with the government's investigation.

## WADE'S CRIMES

Mitchell Wade's greed, corruption, and disdain for the rules that bind honest citizens – be they government contractors, officials, or private individuals – is staggering. In the process, Wade became a very wealthy man. He must now be held accountable.

The factual proffer in this case is quite detailed and there is no need to repeat all of the facts. A few details and themes, however, are worth mentioning.

The charges stem from Wade's ownership of MZM, Inc., which, from 2002-2005, received over $150 million from the Defense Department as a government contractor. MZM's business depended on its receipt of federal defense appropriations. As MZM's owner, Wade's wealth was itself linked to federal appropriations and defense contracts.

Wade sought to enrich MZM and, thus, himself through three criminal means – paying $1.8 million in bribes to Congressman Cunningham; conspiring with Defense Department officials; and making illegal campaign contributions to two Members of Congress who were in a position to assist MZM.

The largest of these schemes was Wade's bribery of Congressman Cunningham. As a member of the Defense Appropriations Subcommittee, Congressman Cunningham had the power to direct vast sums of money to projects and to contractors of his choosing. In or about 2001, Cunningham sought bribes from Wade.[1] The deal was as simple as it was far reaching – Cunningham would use his office to ensure that MZM obtained profitable contracts in exchange for large bribe payments. The Wade-Cunningham relationship was extremely lucrative for both

---

[1] Cunningham first entered into a corrupt relationship with Brent Wilkes, who operated ADCS and has been convicted and sentenced for his conduct.

men, and it continued and escalated until the middle of 2005.

The dozens of bribe payments ranged from cash to real estate to a used Rolls Royce to more exotic items, like expensive rugs and antiques. They included:

- Wade's purchase of Cunningham's home at an inflated price;

- Wade's purchase of a yacht for Cunningham's use;

- Wade's purchase of an antique Louis Phillipe period commode, circa 1850;

- Wade's payment for repair work on the Rolls Royce that Wade purchased for Cunningham;

- Wade's payment of more than $500,000 to Cunningham via checks payable to Cunningham's corporation, Top Gun Enterprises; and

- Wade's payment of Cunningham's bills at resorts, hotels, and exclusive restaurants.

In return, Congressman Cunningham fulfilled his end of the bargain. He made recommendations and took other official action that caused the United States Congress to appropriate money to benefit MZM and Wade. Congressman Cunningham also used his power to pressure and influence Defense Department officials to award contracts in a manner that would enrich MZM and Wade.

Aside from Congressman Cunningham, Wade also sought the assistance of two other Members of Congress in obtaining taxpayer's money for MZM. He did so not by bribing the two Representatives, but by providing their campaigns with almost $80,000 of illegal campaign contributions.[2]

---

[2] There is no evidence that the two Members knew that they were receiving illegal campaign contributions.

Wade's choice of these two Representatives was far from random. Wade thought that the first of these Representatives had the ability to request appropriations for a facility that MZM wanted to open in the Representative's district. Wade believed that the second Representative also would be an advocate for MZM and its facilities. Indeed, a year after giving the second Representative $32,000 in illegal contributions, Wade dined with the Representative and discussed the possibility of MZM's hosting a fundraiser for the Representative and the possibility of obtaining funding and approval for a Navy counterintelligence program in the Representative's district. Wade even prepared a proposal for the Navy counterintelligence program and submitted it to this Representative's staff.

Wade hoped to make these Members particularly receptive to MZM's interests by providing them with large amounts of campaign contributions. Contributing to the campaign of a Member of Congress who has the ability to affect one's business interests is not illegal.[3] But

---

[3] As the Supreme Court explained in *McCormick v. United States*, 500 U.S. 257, 272 (1991):

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private

committing election fraud in the process certainly is. And that is what Mitchell Wade did, over and over again.[4]

In total, Wade unlawfully reimbursed $78,000 of campaign contributions, involving 19 straw donors. These donors were MZM employees and their spouses, who were embroiled in Wade's scheme.

The large scale reimbursement of campaign contributions is no mere technical violation of a regulatory statute. There is, in a general sense, a victim – the voting public. Voters in these two Representatives' districts had the right to know from where the Representatives had raised their money. The very purpose of the reporting requirements in our election law is to arm voters with this information, so that they can vote accordingly. In this case, the voters were led to believe that MZM employees individually and with their own money supported candidates of their choice. They had no idea that one man was behind all of these campaign contributions and were deprived of their right to a fully informed vote.

Wade's criminal activities were not limited to the Legislative Branch. They extended to his corrupt conspiracy to influence the Defense Department procurement process. Wade hired to MZM many Defense Department employees with jurisdiction over MZM's projects. He also hired some of these employees' adult children.

For example, in 2002, MZM entered into a Blanket Purchase Agreement (BPA), that made it eligible to receive up to $225 million by performing work for Defense Department

---

contributions or expenditures, as they have been from the beginning of the Nation.

[4]The government is not alleging that the contributions were an attempt to bribe or pay an unlawful gratuity to the Members of Congress.

customers.[5] Under this BPA, MZM received a task order to perform work on the Facilities Infrastructure and Engineering System (FIRES) Program. MZM's continued receipt of task orders under the BPA depended on its performance. A poor evaluation could cost MZM millions of dollars. Wade provided benefits to a government official who was responsible for evaluating MZM's performance and for requesting a statement of work that enabled MZM to act as a prime contractor on the FIRES project.

In sum, Wade's corruption was no momentary lapse of judgment. It was well thought out, carefully implemented, pervasive, and highly effective at enriching Wade at the expense of the honest government that the public hopefully expects and certainly deserves.

## WADE'S COOPERATION

As bad as Wade's criminal conduct was, his cooperation with the government's investigation, beginning shortly after the allegations against him became public, has been extraordinary.

On June 12, 2005, the San Diego Union Tribune reported that Mitchell Wade took a $700,000 loss from his purchase and then resale of Congressman Cunningham's home.[6] This news report was, to the government's knowledge, Wade's first indication that his relationship with Cunningham or any of his other criminal activities would be investigated.[7] On June 27,

---

[5] A BPA is a contract vehicle that permitted the Defense Department to obtain supplies and services on an as-needed basis through a "charge account" system.

[6] *Lawmaker's Home Sale Questioned*, San Diego Union Tribune, June 12, 2005 (available at www.signonsandiego.com/news/politics/cunningham/20050612-278-lawmaker.html)

[7] The Defense Department began an investigation of MZM prior to the publication of the Union Tribune article. The investigation was not public, and, to the government's knowledge, Wade was not aware of the Defense Department's investigation.

2005, Wade, through counsel, contacted the United States Attorney's Office for the District of Columbia to indicate his willingness to cooperate with the government's investigation.

From the outset, Wade's cooperation took many forms, and went well beyond the normal debriefings and testimony that many other white-collar defendants give.

At Wade's expense, in the summer of 2005, Wade's attorneys compiled and reviewed very large amounts of materials, organized them, and provided them to the government.[8] The production permitted the government to learn about some of the serpentine details of the Cunningham bribery scheme far earlier than it would have absent the cooperation. Many of the documents produced were duplicates of documents that the government obtained from search warrants and from subpoenas, but some documents – that were quite probative – were not and may not have been discovered without Wade's assistance. Wade's production expanded the government's knowledge of the conspiracy and significantly shortened the duration of the government's investigation.

Wade conveyed a wealth of information to the government through many debriefings and through his attorneys.[9] As with the document production, the government already had or would likely have discovered some of the information. Wade, however, provided some valuable details that the government probably would not have uncovered, or would have only done so after much time and expense. For example, Wade's inflated purchase of Cunningham's residence (known to the government prior to Wade's cooperation) and the large checks that Wade wrote to Top Gun

---

[8]Wade's attorneys estimate that they compiled and reviewed over 150,000 pages of documents. The government has not counted the pages, but does not dispute this estimate.

[9]There were at least 23 meetings and teleconferences between Wade or his counsel and the government.

Enterprises left clear paper trails. But the government would have had difficulty in unearthing bribe payments such as (quite expensive and probative) antiques, furniture, rugs, and other purchases. Even with respect to the real-estate transactions, the money that Wade conveyed by check, the Rolls Royce, and yacht, Wade provided details regarding the timing and the circumstances surrounding these transactions that strengthened the case against Cunningham.

The government believes that Wade's cooperation regarding Cunningham sharply increased the pressure on Cunningham to plead guilty and to do so at an early date, that is, on November 28, 2005. In congressional corruption cases, an early guilty plea is particularly important. It ends the ordeal for constituents who have to wonder whether the Representative they have supported for years is corrupt. It allows constituents to return to having a Representative who is not under an ethical cloud and who can thus represent their interests more effectively in Congress. It returns the political process to being a debate about issues and the Representative's positions and effectiveness, rather than about whether the Representative should be a felon. Wade's cooperation hastened Cunningham's plea, and removed the burden of an investigation and possibly a trial from the people of California's Fiftieth Congressional District. It also led to the prompt and stern punishment of a Member of Congress whose conduct was outrageous.

Wade also provided truthful and persuasive testimony in the trial of Brent Wilkes, the owner of military contractor ADCS, who was indicted in San Diego for bribing Congressman Cunningham and related felonies. Wilkes and Cunningham had a corrupt relationship similar to

that of Wade and Cunningham. In fact, Wilkes introduced Wade and Cunningham.[10] At Wilkes's trial, Wade testified about the details of the Wilkes-Cunningham relationship. The jury convicted Wilkes on thirteen felonies. For use at Wilkes's sentencing, Wade provided a detailed and truthful affidavit that assisted the government in establishing the loss amount.

Wade's cooperation extended beyond the Cunningham bribery conspiracy. He debriefed and provided documents regarding the involvement of others in Wade's election fraud. As with the Cunningham conspiracy, the government suspected that Wade had made conduit contributions, but his cooperation provided details that would have been very difficult to uncover. Wade recounted the involvement of Richard Berglund, an MZM employee who served as a middleman for some of the conduit contributions. This information increased the pressure on Berglund to plead guilty to election fraud. Indeed, in plea negotiations, the government and Berglund's counsel discussed the prospect of Wade's testimony.

The government interviewed Wade regarding his interactions with the two Representatives who received the illegal contributions and their staffs. Although these interactions did not lead to criminal charges, Wade's information assisted the government's investigation of these interactions. He should receive credit for this cooperation.

Wade debriefed regarding the activities of Defense Department employees. As outlined above, Wade provided benefits to Defense Department employees in an attempt to induce these employees to show bias toward MZM. He described the benefits he provided. He also recounted the job duties of Robert Fromm, an MZM employee who pled guilty to violating the lifetime

---

[10]Wilkes is Co-conspirator No. 1 in the factual proffer to which Wade agreed as part of Wade's guilty plea.

post-employment ban. Wade's cooperation significantly contributed to Fromm's guilty plea. Although the Defense Department employees who received benefits were not charged for their conduct, the information Wade provided was helpful in the government's investigation.[11]

Wade also debriefed in a large and important corruption investigation unrelated to the above activities. Because there have been, at this point, no charges filed, the description will remain general. In mid-2006, a U.S. Attorney's Office and the FBI interviewed Wade. The investigators considered Wade's information moderately useful and honest. The information was largely background in nature.[12]

---

[11] The lack of charges is not based on any failure in Wade's cooperation. Wade was candid and cooperative. Wade provided benefits that were sometimes unsupported by a paper trial and often small in amount – too small to charge an individual employee, given the circumstances, but large enough to charge Wade, who provided the benefits to several employees. The mental state of an individual employee who received a small benefit can be hard to discern. The mental state of Wade, who dispensed the benefits many times over, was not. At any rate, although Wade's cooperation in this area did not lead to charges, it did assist the government's investigation and he should receive credit for it.

[12] There are two areas in which Wade attempted to assist the government, but he did not possess enough information to assist the government's investigation in a meaningful way.

Beginning in mid-July 2005, Wade provided some general information about Tommy Kontogiannis (Co-conspirator No. 3 in Wade's factual proffer) and some documents. By this time, however, Kontogiannis, had given a lengthy interview to the media and admitted to many of the allegations that gave rise to the charges against him. *See* Jerry Kramer and Marcus Stern, *Boat Sale by Duke Made Him $400,000*, Copley News Service, July 5, 2005 (available at www.signonsandiego.com/news/metro/20050705-9999-1n5duke.html). The government already had or was in the process of receiving the information that Wade provided. Wade had no useful information regarding the involvement of John Michael (Co-conspirator No. 4 in Wade's factual proffer) in the bribery conspiracy.

Wade also provided some very general information regarding the relationship between Brent Wilkes and the now convicted Kyle Dusty Foggo, the former Executive Director of the Central Intelligence Agency. By the time that Wade provided this information, the Wilkes-Foggo relationship was widely reported in the media. Wade's information was very general, largely duplicative of what had been publically reported, and was not useful to the government's

In sum, Wade's cooperation was exceptional in timeliness, substance, and volume. It went well beyond the level of cooperation given by a typical white-collar cooperator who receives a reduction in his sentence. Wade's sentence should reflect this cooperation.

## SENTENCING GUIDELINES

The plea agreement contains many provisions regarding the sentencing guidelines. The parties and the presentence report agree on Wade's total offense level, which is 31. In criminal history category I, level 31 corresponds to a term of imprisonment of 108 to 135 months. The normal guidelines fine range of $15,000 to $150,000 is inapplicable in this case because Count Three, the election-fraud count, is governed by a statutory mandatory-minimum fine of $234,000 and a maximum fine of $780,000. See 2 U.S.C. §§ 441f, 437g(d)(1)(D); U.S.S.G. § 5E1.2(c)(4), app note 5.[13]

---

investigation.

In both of these areas, Wade shared the information that he had, but he simply did not possess information that was useful to the government's investigation.

[13]The Guidelines specifically discuss the fine provisions of the Federal Election Campaign Act:

> The extent of a conciliation agreement between the defendant and the Federal Election Commission, and the extent of compliance with that conciliation agreement, may be appropriate factors in determining at what point within the applicable fine guideline range to sentence the defendant unless the defendant began negotiations toward a conciliation agreement after becoming aware of a criminal investigation.

U.S.S.G. § 5E1.2 app note 5. In this case, Wade did enter into a conciliation agreement with the Federal Election Commission and paid a civil fine of $1 million. Wade, however, began negotiating with the FEC *after* he became aware of the criminal investigation. His conciliation agreement and civil fine should, therefore, not affect the criminal fine that the Court imposes.

## THE GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE
## AND ITS RECOMMENDED SENTENCE

This case is gigantic in scope, both in terms of Wade's criminal culpability and his cooperation. The Court's sentence should sharply punish Wade for his conduct, but should recognize the quantum of his cooperation.

As is always true, the Court should consider the guidelines range and the factors enumerated in 18 U.S.C. § 3553(a). In the language of that statute, the "seriousness of the offense[s]" is grave. Wade was a willing and eager participant in a lengthy conspiracy. He was motivated by avarice. Wade's crimes were no momentary aberration. Thus, the "nature and circumstances of the offense[s]" call for stern punishment. The Court's sentence should speak to all those who contract with our military and who supervise the awarding of those contracts and should tell them, bluntly, that corruption leads to prison. In doing so, the sentence would "afford adequate deterrence to criminal conduct."

Wade was raised in a middle-class home, had a supportive family, a college degree, and a career in the Navy. Back in 1998 and 1999, prior to his bribery of Cunningham, Wade had a very high income.[14] Wade had, in short, advantages that many of the defendants who appear before the Court do not have. This "history" and these "characteristics" of Wade also support strong punishment.

On the cooperation side, Wade has certainly "provided substantial assistance in the investigation or prosecution" of others who have committed offenses. U.S.S.G. § 5K1.1. Indeed, his cooperation has gone well beyond that threshold. Accordingly, the government

---

[14] *See* Presentence Report, ¶ 159.

moves for a downward departure on that basis. In terms of 18 U.S.C. § 3553(a), Wade's cooperation is a relevant mitigating "characteristic[] of the defendant." It also makes it far less likely that Wade will engage in any form of criminal activity in the future. Wade has accepted what he has done, taken responsibility, and done what he could to make amends. And just as the sentence must be punitive enough to deter would-be corrupt actors, it should also send the message that extensive cooperation with the government will be recognized and will result in a correspondingly reduced sentence.

In terms of imprisonment, the government believes that a sentence of 48 months of incarceration would strike the appropriate balance. It would amount to a reduction of 60 months, or 55%, from the low end of Wade's 108-135 month guidelines range. This is a more significant reduction than the government would seek if Wade had offered a more typical level of cooperation.

Some caution is due when comparing sentences among criminal defendants because the individual characteristics of the defendants and of their cases may not be as similar as they might appear from a summary look at the public record. With that caveat, a 48-month prison term would be, appropriately, a much less lengthy sentence than the other principal bribery co-conspirators received. Congressman Cunningham, who entered a pre-indictment plea to bribery conspiracy and tax evasion received a sentence of 100 months of incarceration.[15] Thomas

---

[15] The government recommended a two-point reduction under § 5K1.1, but also sought a two-point enhancement for obstruction of justice. Cunningham's cooperation was not remotely comparable to Wade's. In Cunningham's plea agreement, the parties agreed that his guideline level was 36. The government sought a 120-month sentence, which was the statutory maximum for the counts to which Cunningham pled guilty. At sentencing, the judge cited Cunningham's remarkable service and heroism in the Vietnam War, in which he was a Flying Ace who earned a Navy Cross, two Silver Stars, and a Purple Heart.

Kontogiannis ("Co-conspirator No. 3" in Wade's factual proffer), who pled guilty, after indictment, to one count of money laundering in violation of 18 U.S.C. § 1957, was sentenced to 97 months of incarceration.[16] Brent Wilkes ("Co-conspirator No. 1") received a sentence of 144 months of incarceration after a jury convicted him on thirteen counts (at the trial at which Wade testified).[17]

---

[16] Kontogiannis was in criminal history category III at the time of sentencing.

[17] John Thomas Michael ("Co-conspirator 4") received probation after pleading guilty to one count of an 18 U.S.C. § 371 conspiracy to violate 18 U.S.C. § 1957 and one count of making a false statement, in violation of 18 U.S.C. § 1001. Michael ran the mortgage company through which one of Wilkes's bribes was laundered and was a very minor player in the conspiracy. See Overt Acts b and c in Wade's factual proffer. His conduct is not in the same league as Wade's. The entirety of the criminal conduct to which Michael pled guilty, as delineated in his factual proffer, is:

> Beginning no later than April 2004, defendant agreed with his uncle, Thomas Kontogiannis, and others to engage in monetary transactions, involving what defendant knew to be proceeds of some form of unlawful activities. Defendant knew these transactions would involve over $10,000 in proceeds, and he does not contest that the funds ultimately involved were, in fact, over $500,000 of proceeds of honest services wire fraud and bribery that Brent Wilkes transferred from the Southern District of California to a bank account controlled by Kontogiannis in the Eastern District of New York for the benefit of then-Congressman Randy "Duke" Cunningham.
>
> On August 2, 2005, defendant appeared before a federal grand jury in the Southern District of California that was investigating the possible corruption of Cunningham. During that appearance, defendant willfully gave testimony that he knew to be false. For example, defendant was questioned regarding the structure of certain financial transactions involving Congressman Cunningham that were completed in about early November 2003. At the time of his testimony, defendant knew that these transactions had been structured in a way to accommodate approximately $500,000 that Cunningham expected to receive shortly after the transactions were complete. Defendant intentionally misled the grand jury as to this fact and in doing so defendant intended to, and did, hinder the grand jury and the ability of the United States Attorney's Office to uncover the true nature of these and other financial transactions involving Cunningham, Kontogiannis, and defendant. Likewise, defendant repeatedly and willfully provided knowingly false

A significant fine should also be a component of Wade's sentence. Wade profited immensely from his criminal conduct. In the case of Congressman Cunningham, the government seized, through forfeiture orders, Cunningham's ill gotten gains. There has been no asset forfeiture in this case. Moreover, to this day, Wade remains a wealthy man and has the wherewithal to pay a large fine.[18]

WHEREFORE, the government respectfully requests that the Court grant its motion for downward departure and sentence Mitchell Wade to a term of imprisonment of 48 months and a significant fine.

Respectfully submitted,

JEFFREY A. TAYLOR
D.C. Bar Number 498610
United States Attorney

HOWARD R. SKLAMBERG
D.C. Bar Number 453852
Deputy Chief, Fraud & Public Corruption Section
555 Fourth Street, N.W.
Washington, DC 20001
(202) 514-6961
howard.sklamberg@usdoj.gov

---

testimony regarding Kontogiannis's role relating to financial transactions involving Cunningham. In doing so, defendant intended to, and did, hinder the grand jury and the ability of the United States Attorney's Office to uncover his uncle's role in defendant's business, including his uncle's and his role in transactions relating to Cunningham.

[18]Wade's counsel have provided the government with copies of many heartfelt letters written on Wade's behalf. The government considered these letters in formulating its sentencing recommendation.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was served by electronic mail upon Howard Shapiro, Esq. and Ronald Machen, Esq., this 26th day of November, 2008, by ECF.

_____
Howard R. Sklamberg